## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

TANEEN P.,

        *Plaintiff,*

*v.*

KILOLO KIJAKAZI,
Acting Commissioner of
Social Security Administration,

        *Defendant.*

_____/

Case No. 2:23-cv-11642

Mark A. Goldsmith
United States District Judge

Patricia T. Morris
United States Magistrate Judge

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 8, 11)

## I.  RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Plaintiff Taneen P.'s Motion for Summary Judgment be **DENIED** (ECF No. 8), Defendant's Motion for Summary Judgment be **GRANTED** (ECF No. 11), and the Commissioner's final decision be **AFFIRMED**.

## II.  REPORT

### A.  Introduction and Procedural History

Plaintiff's application for Disability Insurance Benefits ("DIB") was filed on July 29, 2021 (ECF No. 4-1, PageID.104).  Plaintiff alleged she became disabled on November 30, 2015.  (*Id.* at PageID.105).  During the hearing, the ALJ noted that

1

Plaintiff amended the onset date to December 13, 2017.  (*Id.* at PageID.31).  The Commissioner denied these claims initially on March 25, 2022, and upon reconsideration on July 19, 2022.  (*Id.* at PageID.127, 138, 143).  Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which took place on March 21, 2023.  (*Id.* at PageID.49, 149).  The ALJ issued a decision on April 5, 2023, finding that Plaintiff was not disabled.  (ECF No. 4-1, PageID.43).  The Appeals Council denied reviewed on May 25, 2023.  (*Id.* at PageID.15).  Plaintiff sought judicial review on July 11, 2023.  (ECF No. 1).  The parties have filed cross-motions for summary judgment and briefing is complete.  (ECF Nos. 8, 11).

### B.  Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  "[T]he threshold for such evidentiary sufficiency is not high. . . It means—and means only—'such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

## C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 3336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record."   20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

4

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 214 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 4-1, PageID.43). At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity ("SGA") from her amended alleged onset date of December 30, 2017 through her date last insured of December 31, 2020. (*Id.* at PageID.33). At Step Two, the ALJ found the following impairments to be severe: right rotator cuff tear; tendinopathy of the left shoulder; degenerative disc disease of the cervical spine and lumbar spine; cervicogenic headaches; and obesity (20 CFR 404.1520(c)). (*Id.* at PageID.33). The ALJ also noted Plaintiff's left wrist fracture and myalgia which Plaintiff sought treatment for, but concluded they were not severe impairments. (*Id.* at PageID.34). At Step Three, the ALJ found that none of the impairments, either independently or in combination,

met or medically equal any listed impairment including those in Listing 1.00. (*Id.* at PageID.35).

Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 404.1567(b) except that she must avoid work at unprotected heights or around dangerous moving machinery; could not climb any ladders, ropes or scaffolds; could only occasionally climb ramps or stairs; could only occasionally balance, stoop, kneel, or crouch; could not crawl, drive, reach above shoulder level, or be exposed to vibration. (*Id.* at PageID.35). At Step Four, the ALJ found that through the date last insured, Plaintiff could perform her past relevant work as a personnel clerk as the job is generally performed. (*Id.* at PageID.41). In the alternative, the ALJ proceeded to Step Five where he assessed that there are other jobs that exist in significant numbers in the national economy which Plaintiff could also perform. (*Id.* at PageID.42). Accordingly, the ALJ concluded that Plaintiff was not disabled. (*Id.* at PageID.43).

### E. Administrative Record

#### 1. Overview of Medical Evidence

##### a. Treatment Notes

On June 25, 2015, Plaintiff was seen at Northville Podiatry for the flu. (*Id.* at PageID.429). During the visit, Plaintiff indicated she had herniated discs in her back, and had been receiving epidural shots in her lower back to address the issue.

This resulted in "manifestations in her feet secondary to her low back." (*Id.*).
Similar complaints regarding low back pain were recorded throughout her chart in
February, May, and June 2015. (*Id.* at PageID.431, 433, 435, 437).

From 2015 to 2018, Plaintiff was seen at Farmbrook Interventional Pain and
EMG. During these visits, Plaintiff complained of chronic neck and lower back pain
which would vary between seven to ten points on a 10-point pain scale. (*Id.* at
PageID.708–822). During her June 2016 visit, she complained of experiencing
headaches on the right side of her head and had experienced about five or six within
the span of a month. (*Id.* at PageID.723). By December 2016, she was still
complaining of experiencing headaches, but the frequency decreased to three times
a month. (*Id.* at PageID.732). In May 2020, Plaintiff was still complaining of
experiencing headaches approximately three times a week. (*Id.* at PageID.799).

In March 2017, Plaintiff was examined at Farmington Family Physicians. (*Id.*
at PageID.539). There, she complained of headaches, claiming to experience them
three to four times a week. (*Id.*). She also suffered nausea associated with the
headaches but "denied lightheadedness, loss of coordination or balance, dizziness,
memory loss and numbness." (*Id.*). During this visit, she indicated that she was
"feeling down, depressed, or hopeless" for more than half the days in a two-week
period. (*Id.* at PageID.542). But she did not have issues with falling or staying

asleep. (*Id.*). Nor did she have difficulty concentrating on things such as reading the newspaper or watching television. (*Id.*).

In October 2018, Plaintiff was examined at Farmington Family Physicians. (*Id.* at PageID.534). The treatment notes indicate that at the time, Plaintiff was seeing a pain specialist monthly for management of her symptoms, and her treatment plan was to receive low back trigger point injections and epidurals in the neck about three times per year. (*Id.* at PageID.534). The pain specialist suspected that Plaintiff may suffer from fibromyalgia. (*Id.*). The treatment notes also indicate that Plaintiff had a history of migraines and complained of having a headache four to five times per week. (*Id.*). During that visit, she reported "feeling down, depressed, or hopeless" several days per week over the last two weeks. (*Id.* at PageID.537).

In December 2018, Plaintiff was examined at Farmington Family Physicians. (*Id.* at PageID.523). During the visit, she indicated that she was suffering from neck pain. (*Id.* at PageID.531).

In June 2020, Plaintiff was examined at Farmington Family Physicians. (*Id.* at PageID.518). Her treatment notes indicate that she suffered from "chronic neck and back pain" which was being treated by a pain specialist with medication and management. (*Id.*). She also complained of migraines which she experienced three to four times per week. (*Id.*). She denied suffering from "headache, loss of coordination or balance, memory loss and numbness." (*Id.*). She also denied "panic

attacks, stress, suicidal thoughts, trouble falling asleep, trouble staying asleep and hallucination." (*Id.* at PageID.519). She also completed a Patient Health Questionnaire and indicated that she was not "feeling down, depressed, or hopeless." (*Id.* at PageID.521).

From September 2021 to March 2023, Plaintiff continued to receive treatment at Farmbrook Interventional Pain and EMG. (*Id.* at PageID.823–44). The treatment notes reflect that she continued to complain of neck, shoulder, and back pain at various points. (*Id.*).

**b.  State Agency Medical Consultants Reports**

**1.  Dr. Michele Leno, Ph.D.**

Dr. Leno's report reflects notations that indicate Plaintiff was experiencing "adjustment related emotion distress secondary to physical" symptoms, including chronic pain. (ECF No. 4-1, PageID.84, 88). Dr. Leno noted that Plaintiff's ADLs were not significantly limited and she was able to manage mentally demanding tasks. (*Id.*). While she was "tearful and appeared to be in pain during [the] exam . . . overall, she was socially appropriate and demonstrated no significant cognitive impairment." In conclusion, given Plaintiff's pain, "concentration may be more limited for complex instruction; however, simple work activity is not precluded." (*Id.*).

The report goes on to note that Plaintiff has "sustained concentration and persistence limitations." (*Id.* at PageID.91).  Her ability to do the following was not significantly limited: (i) carry out short and simple instructions; (ii) sustain an ordinary routine without special supervision; (iii) work in coordination with or in proximity to others without being distracted by them; (iv) make simple work-related decisions; and (v) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.* at PageID.91–92).  Her ability to do the following was moderately limited: (i) carry out detailed instructions; (ii) maintain attention and concentration for extended periods; and (iii) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (*Id.*).  The limitations were based on Plaintiff's pain and depression. (*Id.* at PageID.92).

### c.  Third-Party Function Report

Tameka R. submitted a third-party function report on Plaintiff's behalf dated November 9, 2021. (ECF No. 4-1, PageID.295).  In the report, she stated that Plaintiff could not complete her job "due to her chronic pain and limited mobility." (*Id.* at PageID.295, 298).  At times, Plaintiff would complain about her inability to sleep. (*Id.* at PageID.297).  Tameka also expressed that Plaintiff was able to manage her bills, count change, handle a savings account, and use a checkbook or money

orders. (*Id.* at PageID.298). Tameka indicated that based on her observation, Plaintiff's conditions affected her ability to perform a number of physical tasks (e.g., lifting, squatting, standing, and kneeling) but did not affect her ability to talk, hear, see, understand, follow instructions, use her hands, get along with others or memorize. (*Id.* at PageID.300). She later explained that Plaintiff's "concentration and ability to complete task[s] on the job was impaired by [the] narcotics she was prescribed." (*Id.*). She also was unable to pay attention for long due to her medication. (*Id.*).

## 2.  Overview of Hearing Testimony

### a.  Plaintiff's Testimony

Towards the end of 2017, Plaintiff stopped working due to the severity of the pain she experienced daily. (ECF No. 4-1, PageID.56). Her lower back, neck, and shoulder pain progressively worsened over time. (*Id.*).

Before she stopped working, Plaintiff was employed by the Navy. For about eight years, she worked as a supply technician for the Navy recruiting department where she checked members into the command hall, engaged in human resources requirements, processed files, inspected homes for potential new recruits, managed the facilities, and fulfilled supply requests. (*Id.* at PageID.52–53, 305). In this role, she would lift items that weighed between 50 and 75 pounds. (*Id.* at PageID.52).

The Vocational Expert categorized this position as a stock control clerk under the DOT.  (*Id.* at PageID.55).

Before working as a supply technician, she worked as a personnel specialist. In this capacity, she was the equivalent of a "civilian [human resources] person and would assist individuals in joining the Navy, uploading information about their dependents, if any, into their file, uploading their medical records, and updating their personnel records.  (*Id.* at PageID.54, 304).  In this role, she usually lifted between 50 and 75 pounds.  (*Id.*).  The Vocational Expert categorized this position as a personnel clerk under the DOT.  (*Id.* at PageID.55).

Her last month of employment with the Navy was in November 2015.  (*Id.* at PageID.62).  During her last year, the Navy accommodated her conditions by allowing her to use a walker and excusing her from lifting more than ten pounds. (*Id.* at PageID.63–64).

Plaintiff's condition makes it difficult to complete daily tasks such as laundry, cleaning, and cooking.  (*Id.* at PageID.57).  Engaging in such tasks causes excruciating pain due to the standing and bending components involved. (*Id.*).  After completing such tasks, it would take Plaintiff a day or two to recover.  (*Id.*).

Plaintiff can only stand for about 15 to 20 minutes before having to sit down and rest.  (*Id.*).  And when standing, she is required to hold onto something.  (*Id.*). She can only sit for about 45 to 60 minutes before rising to stretch, and when sitting

she uses a footrest to elevate her feet and alleviate the back pain.  (*Id.* at PageID.58, 69).  She can only walk for short distances (i.e., the distance required to move between her car and front door), and she uses a buggy or her prescribed walker when she needs to walk longer distances.  (*Id.* at PageID.58).  To alleviate the pain that she is experiencing, she will implement a combination of the following treatments: medication, hot/cold compress, and rest.  (*Id.* at PageID.59).

Plaintiff also suffers from pain in her shoulders which limit her ability to hold a book to read, type for extended periods of time, and the amount of weight she can lift (i.e., no more than five pounds).  (*Id.*).  On one to ten-point scale, she rates her shoulder pain for both shoulders at a six, neck pain at a six, and lower back pain at a five.  (*Id.* at PageID.65).  She also suffers from migraines, which she experiences two to three times a month, and rates them at a ten.  (*Id.* at PageID.60, 65–66).  The migraines cause her to become nauseous, vomit, and lose her balance.  (*Id.* at PageID.60).  Following the onset of a migraine, she is typically bedridden for two to three days.  (*Id.* at PageID.60).

Plaintiff also periodically suffers from insomnia although she is taking prescription medication to address it.  (*Id.* at PageID.60).  During the nights where she is unable to sleep, she will typically sleep past noon the following day.  (*Id.* at PageID.61).

Plaintiff takes a variety of prescription medications for pain and a sleeping pill, but Norco[1] causes her to experience the most significant side effects of memory and word-finding issues. (*Id.* at PageID.61, 287). At times, she also suffers from depression, and overwhelming feelings of despair. (*Id.* at PageID.61–62). To address the pain she suffers, she receives steroid and epidural shots. (*Id.* at PageID.66). The shots are typically administered at the trigger points on her body including in her lower back. (*Id.*). And in 2021, she participated in physical therapy to address a tear in her right shoulder. (*Id.*).

### b. Vocational Expert's Testimony

Kenneth Edward "Ed" Jones, Vocational Expert ("VE"), testified during Plaintiff's hearing. (ECF No. 4-1, PageID.69, 347). She testified that Plaintiff's previous positions qualified as follows:

- Stock Control Clerk at the Navy had the DOT code of 219.387-030, with an SVP of 5, skilled, with light exertion as generally performed and performed at medium.

- Personnel clerk at the Navy had the DOT code of 209.362-026, with an SVP of 4, semi-skilled, at sedentary exertion as generally performed but not performed at sedentary.

---

[1] Norco is an opioid pain medication drug which contains a combination of acetaminophen and hydrocodone. Norco Uses, Dosage & Side Effects, Drugs.com (last accessed June 13, 2024).

14

(ECF No. 4-1, PageID.70)

After collecting this information from the VE, the ALJ presented the VE with a few hypotheticals.  The ALJ posited the following:

> [A]ssume a hypothetical individual of similar age, education, and work experience.  Please assume an ability for al light level of work.  However, this individual must avoid hazards, and that includes work at unprotected heights or around dangerous moving machinery.  And no climbing of any ladders, ropes, or scaffolds.  No more than occasional climbing of ramps or stairs.  Of course, occasional is defined by Social Security as very little to up to one-third of the workday.  No more than occasional balancing, stooping, kneeling, crouching.  No crawling.  No reaching above shoulder level with either upper extremity.  No driving in the course of employment.  And no exposure to vibration.  If you were to assume these abilities and restrictions, would that preclude the past work?

(*Id.* at PageID.70).  The VE testified that this hypothetical individual would be precluded from performing Plaintiff's jobs as Plaintiff performed them but would not be precluded if the job was performed as described by DOT.  (*Id.* at PageID.71).  If the additional limitation of not being able to reach above the shoulder level were added, this would preclude a hypothetical individual from performing the position of stock control clerk, but the hypothetical person would still be able to perform the duties of a personnel clerk.  (*Id.* at PageID.71).

The ALJ then asked if there were any other jobs that Plaintiff's skills could be transferred to that were light jobs.  (*Id.* at PageID.74).  The VE testified that an

administrative clerk position is an option. (*Id.*).  The ALJ then asked if there were any jobs that Plaintiff's skills could be transferred to that were sedentary. (*Id.*).  The VE identified the following: personnel clerk, DOT of 209.362-026, and approximately 75,000 positions available nationally; checker II, DOT of 209.687-010, sedentary, semi-skilled, an SVP of 4, and approximately 1,200 positions available nationally; and appointment clerk, DOT of 237.367-010, semi-skilled, an SVP of 3, and approximately 68,000 positions available nationally.  (*Id.* at PageID.74–76).

Next, the ALJ asked "if we used the hypothetical for light, unskilled jobs - - because she didn't attain 55 until more recently . . . would there be unskilled, light jobs that would fit the parameters of the hypothetical?" (*Id.* at PageID.77).  The VE responded that the only position would be that of office helper, DOT of 239.567-010, SVP of 2, unskilled, light, and approximately 16,000 positions available nationally. (*Id.*).

Plaintiff's counsel asked the VE if the addition of a "handling and fingering" limitation were added to the light hypothetical posited by the ALJ would that change the availability of the light jobs. (*Id.* at PageID.78).  The VE confirmed that the potential light jobs would no longer be available. (*Id.*).  And in response to counsel's question as to whether any of the sedentary positions would be available with a

"handling and fingering" limitation, the VE confirmed that those jobs would no longer be available either.  (*Id.*).

The VE confirmed that his testimony regarding the transferability of Plaintiff's skills was based on the DOT and on his experience.  (*Id.*). His testimony regarding bilateral reaching was based on the DOT.  (*Id.* at PageID.77–78).

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1)    Licensed physician (medical or osteopathic doctor);

(2)    Licensed Psychologist, which includes:

    (i)    A licensed or certified psychologist at the independent practice level; or

    (ii)    A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)    Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending

17

on the scope of practice in the State in which the optometrist practices;

(4)    Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5)    Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6)    Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7)    Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8)    Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.*, § 404.1502(d).

18

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.*, § 404.1502(e). "This includes, but is not limited to: (1) You; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.*, § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(1).

19

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.*, § 404.1520c(c)(3). This factor will include the analysis of:

    (i)    Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

    (ii)    Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

    (iii)    Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

    (iv)    Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

    (v)    Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider "[t]he medical opinion or prior administrative

medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.*, § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.*, § 404.1520c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively

feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.*, § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.*, § 404.1520c(b)(2). As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

22

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.*, § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.*, § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.*, § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i)    Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

23

Case 2:23-cv-11642-MAG-PTM   ECF No. 13, PageID.1018   Filed 06/20/24   Page 24 of 41

(ii)    Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

(iii)   Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)    Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)     Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.*, § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.*, § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

24

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.*, § 404.1502(f).  Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.*  Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques.  Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.*, § 404.1502(g).  Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests." *Id.*, § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain.  "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or

nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.*, § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.*, § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.*, § 404.1529(a). The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

26

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms."  This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*, § 404.1529(c)(3).

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account…We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]"  *Id.*   The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

(i)      [D]aily activities;

(ii)     The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)   Treatment, other than medication, . . . received for relief of . . . pain;

(vi)   Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.*, § 404.1530(a). Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.*, § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)   The specific medical treatment is contrary to the established teaching and tenets of your religion;

(2)   The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)   Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)   The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

28

(5)   The treatment involves amputation of an extremity, or major part of an extremity.

*Id.*, § 404.1530(c).

## G.  Argument and Analysis

Plaintiff's motion for summary judgment requests that the Court reverse the ALJ's decision and remand the case for two reasons: (1) the ALJ only "provided a conclusory analysis that Plaintiff's physical impairments did not meet or medically equal any listed impairment"; and (2) the ALJ's RFC is not supported by substantial evidence as the ALJ failed to consider the effect of mild limitations in concentration, persistence, and pace on past relevant semiskilled work.  (ECF No.8, PageID.952, 954–55).  As to this second argument, Plaintiff contends she has "more than minimal work-related mental limitations" based on the evidence of having "dysphoric mood, anxiety and tearfulness."  (*Id.* at PageID.955–56).

### 1.  Headaches/Migraines and Listing 11.02(B)

As to the first argument, Plaintiff contends that the ALJ was required to provide a detailed analysis of "why Plaintiff's treatment notes from her medical team as well as her testimony fail to support equaling the Listing at 11.02." (ECF No. 8, PageID.953–54).  Further, the ALJ was required to discuss the elements of the Listing, the descriptions of Plaintiff's episodes as provided by her doctors, Plaintiff's treatment as outlined in the record, or the limitations as described by Plaintiff and in her medical record.  (*Id.* at PageID.954).  The Commissioner counters that

29

substantial evidence supports the ALJ's determination that Plaintiff's headache impairment did not meet or equal the listings at Step 3 of the analysis. (ECF No. 11, PageID.972). And that there is no requirement that the ALJ "articulate, at length, the analysis of the medical equivalency issue." (*Id.* at PageID.975 (citing *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006))).

At Step Three, Plaintiff bears the burden of proving that her impairments meet or medically equal a particular listing. *See Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987); *Johnson v. Comm'r of Soc. Sec.*, No. 15-449, 2016 WL 2342892, at *2 (W.D. Mich. Apr. 15, 2016) (citing *Bingaman v. Comm'r of Soc. Sec.*, 186 Fed. App'x 642, 645 (6th Cir. 2006) ("Plaintiff bears the burden establishing that [she] satisfies the requirements of a listed impairment."). The Listing of impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). In essence, a claimant who meets or medically equals the requirements of a listed impairment will be deemed conclusively disabled. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). "A claimant must satisfy all of the criteria to meet the listing." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th Cir. 2009). And

all of the criteria must be met concurrently for a period of at least twelve continuous months.  *See* 20 C.F.R. §§ 404.1509.

Primary headache disorder is not included in impairments listed in 20 C.F.R. Part 404, Subpt. P. App. 1.  However, the SSA may find that the condition, alone or in combination with another impairment(s), medically equals a listing.  *See* SSR 19-4p, 2019 WL 4169635, at *7–8 (Aug. 26, 2019).

The condition is analyzed under Listing 11.02B or 11.02D, the "most closely analogous listed impairment[s]."  *Id.* at *7.  SSR 19-4p instructs:

> To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an AMS of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

*Id.* (citing 20 C.F.R. Part 404, Subpt. P, App. § 11.02 (Mar. 14, 2018)).

Under 20 C.F.R. § 404.1526, "an impairment is medically equivalent to a listed impairment . . . if it is at least equal in severity and duration to the criteria of any listed impairment." The regulation states in relevant part that a finding of

medical equivalence can be made where (b)(1) the claimant has an impairment found among the listed impairments that (A) does not meet all of the requirements of the listing or, (B) meets all of the requirements but "one or more of the findings is not as severe as specified in the particular listing" provided that "other findings related to [the] impairment ... are at least of equal medical significance to the required criteria." *Id.* "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990) (emphasis in original).

A finding of equivalency under Listing 11.02 can be made without evidence of seizures. *Jandt v. Saul*, No. 1:20-CV-00045, 2021 WL 467200, at *8 (W.D. Ky. Feb. 9, 2021). Symptoms including "aura, alteration of awareness, and intense headache with throbbing and severe pain," "nausea and photophobia," and the need to "lie down in a dark and quiet room for relief," all lasting up to 72 hours twice weekly are sufficient to show medical equivalence. *Id.* (quoting Social Security POMS DI 24505.015(B)(7)(b)).

Here, Plaintiff testified that she suffered from migraines, which she experienced two to three times a month, and rated them at a ten on a 10-point pain scale. (ECF No.4-1, PageID.60, 65–66). The migraines would cause her to become

32

nauseous, vomit, and lose her balance.  (*Id.* at PageID.60).  Following the onset of a

migraine, she would typically become bedridden for two to three days.  (*Id.* at

PageID.60).  While the ALJ's opinion does not discuss these specific symptoms in

the Step III portion of the analysis, the information is contained in the section where

he discusses Plaintiff's RFC.  Specifically, it reads

> The medical records prior to the date last insured also
> show that **the claimant has complained of headaches**,
> **which she said occur 5-6 times per month or 3-4 days**
> **per week and are associated with nausea** (see, e.g.,
> 5F/67; 8F/16, 25, 92).  At a video telemedicine
> appointment in June 2020, she reported having severe
> headaches that last about 3 days at a time (3F/32; see also
> 5F/46).  **At that time, she was unable to get out of her**
> **bed due to disabling headache** (3F/32).  She was
> diagnosed with cervicogenic headache and advised to
> continue Norco and she was also prescribed Compazine
> 10mg and amitriptyline 25mg at bedtime as needed for
> headaches (3F/32).  In May 2020, amitriptyline was added
> to her medication regimen for headaches (8F/92).

(*Id.* at PageID.37).  The ALJ goes on to explain that Plaintiff's allegations "are not

fully consistent with the objective evidence."  (*Id.* at PageID.38).  First, he explains

that "despite her allegations of neck pain and associated headaches, her MRI of the

cervical spine showed relatively mild abnormalities."  (*Id.*).  Further, "she noted that

medications took the 'edge off of her headache.'"  (*Id.* at PageID.39).  And thus her

"positive response to treatment without bothersome side effects tends to suggest that

her pain was not severe or as debilitating as she claims through the date last insured."

(*Id.*).

Plaintiff's medical records show that while the frequency of her headaches decreased from June to December 2016, she reported that they became more frequent in March 2017. (*Id.* at PageID.539, 723, 732). In March 2017, Plaintiff complained of experiencing headaches three to four times a week. (*Id.* at PageID.539). She also reported suffering from nausea associated with the headaches but "denied lightheadedness, loss of coordination or balance, dizziness, memory loss[, or] numbness." (*Id.*). During this visit, she indicated she was "feeling down, depressed, or hopeless" for more than half the days in a two-week period. (*Id.* at PageID.542). But she did not have issues falling or staying asleep, or concentrating on things such as reading the newspaper or watching television. (*Id.*). In May 2020, as noted above, Plaintiff's treatment notes state that she reported experiencing headaches approximately three times a week. (*Id.* at PageID.799). The notes also indicate that she was experiencing nausea and light sensitivity and was "unable to get out of her bed due to a disabling headache." (*Id.*). She was directed to continue taking Norco as prescribed, and she was also prescribed Amitriptyline to help alleviate the severity of her headaches. (*Id.*).

While Plaintiff's record supports the proposition that she frequently suffered from headaches and migraines, the record also contains substantial evidence to support the notion that she did not regularly experience any of the other symptoms listed in SSR 19-4p, which are to be considered when establishing equivalency, such

as aura or ongoing side effects.  Further, as the ALJ noted Plaintiff reported that the medications she was prescribed took the "edge off of her headache."  (*Id.* at PageID.39).   And after reviewing Plaintiff's record, the ALJ concluded that Plaintiff's "positive response to treatment without bothersome side effects tends to suggest that her pain was not severe or as debilitating as she claims through the date last insured."  (*Id.*).  Plaintiff has not highlighted any other evidence in the record to show otherwise.   Instead, she merely argues that the ALJ should have fully articulated his rationale in the section of the decision formally labeled as the ALJ's "Step III" discussion. As the Commissioner correctly argues, the ALJ was not required to do so.

Plaintiff has not demonstrated that she met or equaled Listing 11.02, and the ALJ did not err in declining to discuss that listing. *See Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) ("[N]either the listings nor the Sixth Circuit require the ALJ to 'address every listing' or 'to discuss listings that the applicant clearly does not meet.'")   Further, the Undersigned suggests that substantial evidence supports the ALJ's finding that Plaintiff did not meet or medically equal the standard under Listing 11.02(B).

### 2.  Mental Limitations

Plaintiff argues that her case should be remanded as the ALJ's RFC is not supported by substantial evidence due to his failure to consider the effect of mild

limitations in concentration, persistence, and pace on past relevant semiskilled work. (ECF No.8, PageID.952, 954–55).  Further, as to the second argument, Plaintiff contends she has "more than minimal work-related mental limitations" based on the evidence of having "dysphoric mood, anxiety and tearfulness." (*Id.* at PageID.955–56).  Plaintiff also points to Plaintiff's reports of suffering from headaches which leave her bedridden, and her pain management doctor's notes that there are times when Plaintiff's pain is "severely increased" and causes her to suffer muscle spasms, and shooting pain down her arm. (*Id.* at PageID.956).

The RFC refers to the most a claimant can do despite her limitations.  20 C.F.R. § 404.1545(a).  In assessing a claimant's RFC, an ALJ must consider all of the claimant's medically determinable impairments, including those that are not severe.  *See* 20 C.F.R. § 404.1545.  Further, when submitting a hypothetical to the vocational expert, the ALJ must accurately convey all of a claimant's medically established limitations.

"The RFC does not need to reflect the impairments if the record supports a finding that the impairments do not result in functional limitations." *Mehay v. Comm'r of Soc. Sec.*, No. 19-12991, 2021 WL 1175285, at *5–6 (E.D Mich. Mar. 29, 2021).  The Sixth Circuit has made clear that "[t]he RFC describes the claimant's residual abilities or what a claimant can do, not what maladies a claimant suffers from . . . A claimant's severe impairment may or may not affect his or her functional

capacity to do work.  One does not necessarily establish the other." *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007) (quotations and citations omitted).

Here, the ALJ found that claimant had a "mild limitation" in the third functional area of "concentrating, persisting or maintaining pace" but "[t]here were no objective findings of impaired concentration or slowed thought processes." (ECF No. 4-1, PageID.35).  The ALJ explained that although Plaintiff testified at the hearing that she struggled with "memory loss, word-finding difficulties, and insomnia" her Patient Health Questionnaire showed "no significant depressive symptoms," and her psychiatric examinations generally "showed that she was oriented, made good eye contact, and had normal speech, **attention**, thoughts, and **cognition/memory**." (*Id.* at PageID.35) (emphasis added).  The ALJ noted that while Plaintiff experienced "more significant depressive symptoms on one occasion in March 2017 . . . she indicated that her symptoms were due to 'being sickly.'" (*Id.*).

Plaintiff points to a record from Dr. Ibrahim Youseef to support her position, but her representation of the records is a bit skewed.  She highlights Dr. Ibrahim Youseef's treatment notes which reflect that she was "having dysphoric mood, anxiety[,] and tearfulness." (ECF No. 8, PageID.956).  However, Plaintiff's brief omits the note that most of these feelings were reactionary to Plaintiff's "major

problem[s]" which were physical.  Further, while Dr. Youseef's record shows that Plaintiff "**became tearful** when she [began talking] about her pain." (ECF No. 4-1, PageID.420) (emphasis added).  The record shows that Plaintiff became tearful because she was discussing a painful experience, which is not uncommon, not that she was tearful in general.  In fact, the same record notes that Plaintiff "was pleasant and insightful," and "[h]er affect was full [of] range and appropriate." (*Id.*).  Further, her mental activity was record as "spontaneous, logical, and coherent." (*Id.*).  She was recorded as having "no formal thought disturbances or other problems" in the Stream of Mental Activity area.  (*Id.*).  And while she was not able to enjoy her life, she was still hopeful for the future.  (*Id.*).  Despite Plaintiff's representation, this record undercuts her argument that the ALJ's RFC was not supported by substantial evidence.

Plaintiff's Farmington Family Physicians treatment notes further support the ALJ's decision not to include limitations for Plaintiff's mild limitation in concentration, persistence, and pace.  In March 2017, Plaintiff was examined at Farmington Family Physicians.  (*Id.* at PageID.539).  During this visit, she indicated she was "feeling down, depressed, or hopeless" for more than half the days in a two-week period.  (*Id.* at PageID.542).  But she did not have issues with falling or staying asleep, nor did she experience difficulty concentrating on things such as reading the newspaper or watching television.  (*Id.*).  Her ability to concentrate on things such

as reading the newspaper and watching television further shows that she did not have issues concentrating.

Next, Plaintiff points to her testimony regarding her headaches and migraines. But this argument, as discussed in Section II(G)(1), is not persuasive. While the record shows that Plaintiff suffered from headaches and migraines, it also shows that Plaintiff's "positive response to treatment without bothersome side effects tends to suggest that her pain was not severe or as debilitating as she claims through the date last insured." (*Id.* at PageID.39). Thus, this does not support Plaintiff's proposition that the ALJ's RFC is not supported by substantial evidence.

Last, Plaintiff references the treatment note which indicates that at times the pain she experiences is so severe that it causes muscle spasms and results in experiencing pain shooting down into her arms. (ECF No. 8, PageID.956). Plaintiff herself attests that she is not always experiencing this level of pain. During her hearing, on a one to ten-point scale, she rated her shoulder pain for both shoulders at a six, neck pain at a six, and lower back pain at a five. (ECF No. 4-1, PageID.65).

The ALJ's report shows that he considered and assessed Plaintiff's mild limitation in concentration, persistence and pace but found "[t]here were no objective findings of impaired concentration or slowed thought processes." (*Id.* at PageID.35). Furthermore, the one record proffers to support her argument, when viewed in its entirety instead of a piecemeal fashion, undercuts her position.

Plaintiff fails to show any reversible error based on the ALJ's consideration and discussion of the evidence related to her mild limitation in concentrating, persistence, and pace.  Further, the ALJ's analysis regarding Plaintiff's headaches demonstrates that he consideration her condition but also noted that her positive response to the treatment shows that her pain was not as severe or debilitating as she alleges.  It is her burden to establish her functional limitations, and she has failed to do so in regard to her mild limitation in concentrating, persistence, and pace. *Lee v. Comm'r of Soc. Sec.*, No. 19-10337, 2020 WL 1139710, at *6 (E.D. Mich. Mar. 9, 2020).

## H.  Conclusion

For these reasons, I would conclude that substantial evidence supports the Commissioner's denial of benefits, and I recommend **DENYING** Plaintiff's motion, (ECF No. 8), **GRANTING** the Commissioner's motion, (ECF No. 11), and **AFFIRMING** the Commissioner's final decision.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. §

636(b)(1.) Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981.) The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d.) The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: June 20, 2024                          S/ PATRICIA T. MORRIS
                                             Patricia T. Morris
                                             United States Magistrate Judge

41